IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DWAYNE M., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 17 C 7350 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Dwayne M., has filed a motion for summary judgment seeking reversal or remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying his claim for Social Security disability benefits (doc. # 20: Pl.'s Mot. for Summ. J.). The Commissioner has filed a response asking the Court to affirm its decision (doc. # 28: Def.'s Resp.), and plaintiff has filed a reply (doc. # 29). For the reasons that follow, we grant Mr. M.'s's motion and deny defendant's motion.

I.

Mr. M. filed a claim for disability insurance benefits ("DIB") in October 2013 alleging impairments of "blood clots, left shoulder injury." He contends the onset date of his disability was September 26, 2013, when he injured his left shoulder at work (R. 91, 188). Plaintiff's claim was initially denied initially on January 24, 2014, and on reconsideration on September 29, 2014, after which he requested a hearing before an Administrative Law Judge ("ALJ") (R. 98, 109, 123). On April 7, 2016, the ALJ held a hearing at which plaintiff and a vocational expert ("VE") testified

---

[1] On October 20, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 20).

(R. 35-90). The ALJ issued an opinion denying Mr. M.'s claim for benefits on July 18, 2016 (R. 16-34). On August 10, 2017, the Appeals Council upheld the ALJ's determination, making it the final opinion of the Commissioner (R. 1-6). *See* 20 C.F.R. § 404.981; *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

## I.

We begin with a summary of the evidence in the record that bears on our ruling.

### A.

Mr. M. was born on October 5, 1961. He was 52 years old on his alleged onset date of September 26, 2013, which is considered by the Commission to be "closely approaching advanced age." By the time of the hearing, Mr. M. was nearly 55 years old, which is considered "advanced age." 20 C.F.R. § 404.1563 (R. 91). In his application for benefits, Mr. M. contended that he stopped working "because of [his] conditions" (R. 219). Plaintiff testified that he sustained a left shoulder injury at work in September 2013; the medical record shows that he visited the hospital for an x-ray of his shoulder on September 25, 2013, although the record does not contain a copy of the x-ray results (R. 73, 225, 270). While undergoing physical therapy for this injury, plaintiff was also diagnosed with a pulmonary embolism, or blood clots in his legs, and subsequently with deep vein thrombosis ("DVT") (R. 73-74).[2] Plaintiff underwent surgery on his left shoulder in April 2015. As we explain below, plaintiff was treated simultaneously for both his shoulder injury and his blood clot/DVT, although not necessarily by the same doctors.

---

[2] Plaintiff testified that he was laid off from his job as building inspector for the Will County Land Use Department in September 2013 for failing to obtain two required certifications (R. 46). While there is some evidence that plaintiff was also working as a plumbing inspector for Will County at the same time, it is not clear what job he was performing at the time of his injury (R. 77-78, 209, 230).

2

Two days after plaintiff's shoulder injury, on September 27, 2013, plaintiff visited an emergency room after becoming dizzy and nearly fainting while driving; he was diagnosed with a syncopal episode related to high blood pressure and admitted to the hospital until September 29, 2013, when he was discharged with medications for his blood pressure (R. 275-76). On October 12, 2013, plaintiff was admitted to Presence St. Joseph Medical Center and diagnosed with a pulmonary embolism and DVT after experiencing increased leg pain during physical therapy for his shoulder (R. 273-74). He was discharged on October 19 with a prescription to take anti-coagulant medication and a recommendation to follow up with a hematologist (R. 80). Plaintiff began treating with Ali Lakhani, M.D., a hematologist/oncologist, in October 2013 (R. 403-07). On October 23, 2013, Dr. Lakhani sent a letter to the Will County Land Use Department stating that plaintiff needed medical leave beginning October 11, 2013 and lasting at least until October 30, 2013 because of his DVT (R. 355). On November 10, 2013, plaintiff was again admitted to the hospital because of his DVT; this time he was diagnosed with a cystic mass that was treated conservatively, with warm pads, fluids and Tylenol (R. 411). He was discharged on November 15, 2013 (*Id.*).

With respect to plaintiff's shoulder injury, an MRI taken on October 23, 2013 showed an almost complete tear of his rotator cuff, and a "SLAP-type tear of the superior labrum" (R. 357).[3] His initial attempt at physical therapy was halted when he was diagnosed with DVT and pulmonary embolism (R. 364). Plaintiff was initially treated by orthopedist, Steve Markovski, M.D., who recommended surgery to repair his torn rotator cuff; plaintiff testified that his surgery was first

---

[3] The rotator cuff is a group of four muscles and tendons that stabilize the shoulder joint. Part or all of the muscles and tendons may be impacted in a rotator cuff tear-type injury. A "SLAP" tear impacts the cartilage in the shoulder joint. https://www.mayoclinic.org/diseases-conditions/rotator-cuff-injury/multimedia/rotator-cuff-damage-video/vid-20086379 (visited on May 8, 2019); https://www.ucsfhealth.org/conditions/slap_tear/ (visited on May 8, 2019).

3

postponed because of a dispute with his workers' compensation insurer and then because of the need to resolve problems with his DVT and blood pressure (R. 62, 376 585). Plaintiff also had regular appointments with his primary care physicians, Paramjit Sikand and Niraj Shah, M.D., who monitored, but did not formally treat, both his shoulder injury and his subsequent DVT issues beginning in September 2013 (R. 364-74, 461-63). Plaintiff continued to complain of shoulder pain at subsequent appointments with Drs. Sikand, Shah and Markovski throughout the remainder of 2013 and into 2014 (R. 461-75, 500, 503-06, 532-47). They treated him with pain medication and recommended continued physical therapy when he was able (*Id.*).

Plaintiff continued to treat with Dr. Lakhani with respect to his DVT (R. 641-53). A doppler study performed on May 19, 2014 was negative for DVT, although Dr. Lakhani's treatment notes between September 2014 and June 2015 describe Mr. M.'s DVT condition and "other pulmonary embolism and infarction" as "active" (R. 519, 642-52). Dr. Lakhani also suggested that plaintiff's work as a plumber was a possible cause of his DVT because of the significant amount of time he spent working on his knees; the doctor also noted in every treatment note that plaintiff was obese (R. 642-52). In his treatment notes, Dr. Lakhani recommended that plaintiff wear compression stockings and keep his left leg elevated (R. 643-650). Elsewhere in his treatment notes, Dr. Lakhani wrote that plaintiff's "performance status" was for "no physically strenuous activity, but ambulatory and able to carry out light or sedentary work (e.g. office work, light house work)." *Id.*

Plaintiff underwent shoulder surgery on April 20, 2015 with Nikolas Garbis, M.D. (R. 591-93). He began physical therapy in June 2015 and generally continued to attend two times each week until early 2016, although he cancelled several appointments for unspecified reasons and missed others for trips out of town (R. 570-80). Progress notes from plaintiff's physical therapy show him meeting his short-term recovery goals by August 2015, and report that his long-term

4

goals were progressing by December 2015 (*Id.*). Dr. Garbis released plaintiff to return to work in February 2016 with no restrictions, although with the understanding that if he had problems because of his injury, he could return to Dr. Garbis for reevaluation (R. 54, 584). Plaintiff testified at his hearing that he asked his doctor for clearance to return to work because he needed the money (R. 54). However, plaintiff did not return to work (R. 73). Mr. M. also continued to have occasional appointments with Dr. Shah in 2015 and 2016 (R. 590-601). In a March 2016 treatment note, Dr. Shah wrote that plaintiff had returned to work. Plaintiff testified that this was incorrect and was likely a misunderstanding related to the fact that he had gotten a return-to-work letter from Dr. Garbis (R. 59).

Dr. Lakhani's treatment notes concerning Mr. M.'s DVT condition for the period after plaintiff's shoulder surgery are nearly identical to those he completed before surgery (R. 643-53). Dr. Lakhani continued to note that a "recent workup with CT angiogram and Doppler ultrasound was negative" and that plaintiff was told to keep his leg elevated, wear compression stockings, and continue to take aspirin (R. 643-44).

**B.**

Two non-examining state agency doctors provided medial opinions. On January 24, 2014, Julio Pardo, M.D., reviewed plaintiff's medical record and diagnosed him with "disorders of muscle, ligament and fascia" and "other diseases of blood and blood-forming organs" (R. 95). Dr. Pardo found that plaintiff was not disabled because it was expected that plaintiff's upcoming shoulder surgery would eliminate any limitations plaintiff had in fewer than twelve months from his onset date (R. 96).

On reconsideration, on September 29, 2014, Dr. Young-Ja Kim reviewed the medical record and agreed that plaintiff was not disabled, particularly because plaintiff's treating physician,

5

Dr. Lakhani, opined that plaintiff was able to perform light or sedentary work. As support for this opinion, Dr. Kim described Dr. Lakhani's examination findings as revealing "tenderness to lumbar spine, but ROM (range of motion) was normal and there was no weakness. Left shoulder did have some tenderness with restricted ROM (R. 104)."[4] Dr. Kim provided a residual functional capacity ("RFC") that opined plaintiff was able to occasionally lift up to 20 pounds, frequently lift up to 10 pounds, and stand, sit, or walk for six hours in an eight-hour work day (R. 105). Dr. Kim also limited plaintiff to occasional reaching overhead with his left arm (R. 106). Dr. Kim opined that plaintiff was not disabled, because he was expected to be able to recover from his impairments in fewer than twelve months (R. 110).[5] In his opinion, Dr. Kim opined that plaintiff was able to perform his past relevant work as a building inspector as he actually performed the work between 2004 and 2013 (R. 107).

## C.

During the hearing, the VE testified that plaintiff's work as a plumbing inspector was a skilled position at a seven level, which is classified as light in the Dictionary of Occupational Titles ("DOT"), but medium to heavy as the plaintiff described it (R. 79). The VE classified plaintiff's other past work (as maintenance worker, plumber, and pipe fitter) as medium to heavy as well

---

[4] Dr. Lakhani's treatment notes that contain the opinion on which Dr. Kim relies are dated between and January 7, 2014 and May 20, 2014, and the bulk of them concern Dr. Lakhani's treatment of Mr. M.'s DVT and pulmonary embolism; the minimal discussion of plaintiff's shoulder injury is part of the doctor's general review of all of plaintiff's physical systems (R. 509-18). Dr. Lakhani's function statement on which Dr. Kim apparently relies is the single sentence in the "performance status" section which suggests plaintiff can perform light or sedentary work.

[5] Although both Agency doctors find that plaintiff was not disabled because he was expected to recover from his injury within 12 months, both apparently gave this opinion without reference to plaintiff's injury date; indeed, at the time of Dr. Kim's opinion in September 2014, plaintiff's injury was already 12 months old, and he had yet to recover from it.

(*Id.*). The judge then asked the VE about three different hypothetical situations,[6] all of which assumed an individual with the same age, education, and work history as the plaintiff.

The first hypothetical asked about an individual who had the capacity to perform at all exertional levels but could only occasionally reach with his upper left extremity (R. 80). The VE testified that an individual with such a limitation would only be able to perform plaintiff's past work as a plumbing inspector, both as classified in the DOT and as performed, because all of his other jobs required bilateral reaching (R. 80-81). In the second hypothetical, the individual could perform light work with occasional reaching with the upper left extremity (R. 81). In such a case, the VE testified that a hypothetical individual could perform the job of plumbing inspector as it is classified in the DOT, but not as the plaintiff performed it (R. 81-82). In the third hypothetical, the ALJ asked the VE to assume the individual could work at the light exertional level, but never reach with the upper left extremity (R. 82). The VE testified that none of plaintiff's past work would be available, but that there were "a few" unskilled jobs at the light level that would essentially allow the plaintiff to work one-handed, such as account investigator, counter clerk, and attendant (*Id.*).[7]

## II.

In his opinion, the ALJ followed the familiar, five-step process for assessing a disability claim. At Step One, he determined that plaintiff had not engaged in substantial, gainful activity since his onset date (R. 21). At Step Two, he determined that plaintiff had the severe impairments of "disorders of the muscle ligament and fascia and other disorders of blood and blood forming

---

[6] Toward the end of the hearing, the ALJ gave the VE a fourth hypothetical that included the limitation of the individual missing up to 20 percent of the work day because of pain. The VE testified that such a limitation would eliminate all possible jobs (R. 88).

[7] The jobs the VE identified as being able to be performed one-handed were account investigator, 241.367-038, with 7,000 jobs nationwide, counter clerk, 249.366-010, with 1,800 jobs nationwide, and attendant, 349.677-081, with 6,000 in the national economy. The VE did not information about how many of these jobs were located in Illiniois (R. 83, 84).

7

organs," and the non-severe impairments of diabetes mellitus type II and hypertension (*Id.*). At Step Three, the ALJ determined that plaintiff did not have a listed impairment, and then set his RFC as the capacity to perform light work, except that he can never reach with his upper left extremity (R. 22). At Step Four, the ALJ held that "transferability of job skills is not material . . . because using the Medical-Vocational Rules . . . supports a finding that the claimant is 'not disabled' whether or not the claimant has transferable job skills," citing SSR 82-41 and 20 CFR 404.1569 and 404.1569(a) (R. 28).[8] At Step Five, the ALJ found that there were jobs in the national economy that existed in significant numbers that the plaintiff could perform (*Id.*).

### III.

"We will review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence." *Decker v. Colvin*, No. 13 C 1732, 2014 WL 6612886 at *9 (N.D. Ill. Nov. 18, 2014). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480 at *4 (N.D. Ill. May 6, 2015). The Court will not reweigh evidence or substitute its own judgment for that of the ALJ. *Decker* 2014 WL 6612886 at *9. In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Id.*, quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). Instead, the Court must be able to trace the ALJ's reasoning from the evidence to the result. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015).

Plaintiff argues that the ALJ erred in finding him not disabled because: (1) the ALJ's determination that Mr. M.'s statements about the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence" was legally insufficient; (2)

---

[8] The ALJ's citations do not explain what the Medical-Vocational Rules are or which one(s) he followed to determine that plaintiff was not disabled, even without transferable job skills.

8

the ALJ's RFC assessment was not supported by substantial evidence; and (3) the ALJ's determination that plaintiff could perform other jobs in the national economy is not supported by substantial evidence (Pl. Mem. in Support at 9, 15, 19). We remand because we find that the ALJ's assessment of plaintiff's RFC was insufficient, and thus do not reach plaintiff's other assignments of error.

## IV.

The RFC is an assessment of what work-related activities the claimant can perform despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. §§ 404.1545(a)(1); 416.1545(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3). Moreover, in making an RFC determination, the ALJ must consider and account for the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment. 20 C.F.R. § 404.1523; *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir.2009); *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir. 2009).

An ALJ must evaluate all relevant evidence when determining an applicant's RFC, including evidence of impairments that are not severe. 20 C.F.R. § 404.1545(a); *Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir.2008). The Court will uphold an ALJ's decision if the evidence supports it, and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review. *Eichstadt v. Astrue,* 534 F.3d 663, 665–66 (7th Cir.2008). Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence. *Denton v. Astrue,*

596 F.3d 419, 425 (7th Cir.2010). Furthermore, an ALJ must analyze a claimant's impairments – both severe and non-severe – in combination. *Terry,* 580 F.3d at 477.

In this case, the ALJ found that plaintiff had two severe impairments, one related to his shoulder injury and one related to his problems with blood clots and DVT. But although he summarized the medical records related to plaintiff's treatment for his blood clots and DVT, the ALJ's RFC determination and his determination that plaintiff is not disabled focused exclusively on only one of these impairments: plaintiff's shoulder injury. The ALJ was entitled, of course, to find that plaintiff's blood clot impairment did not create any limitations on his ability to work, but he needed to explain why he made such a finding. The ALJ failed to do so. The ALJ's analysis of the evidence and explanation for his RFC determination suffers from several deficiencies which require remand.

**A.**

To begin with, we cannot tell from the ALJ's opinion if he considered whether plaintiff's blood impairment caused any sort of limitation at all. During the hearing, the ALJ gave the VE a total of four hypotheticals, all of which described an individual who was limited or completely precluded in his ability to reach with his left arm. The VE's testimony about the unskilled, light work positions that plaintiff could perform therefore accounted only for his shoulder injury, not for any potential limitations related to his DVT. Therefore, we are unable to trace the ALJ's reasoning in failing to account for plaintiff's DVT in his RFC.

We recognize that the medical record is not particularly clear with respect to what limitations plaintiff's DVT caused as they related to his ability to work. But the evidence is not zero: plaintiff was hospitalized twice because of problems with blood clots and DVT, and Dr. Lakhani recommended that, even when plaintiff was not experiencing acute DVT, he wear

10

compression stockings and elevate his legs. Dr. Lakhani also commented that plaintiff's previous jobs and his lifestyle (including his obesity) contributed to these problems. Moreover, the ALJ found that plaintiff's blood disorder was a severe impairment. While it is possible that an impairment can be severe and yet not cause any limitations on a plaintiff's ability to stand or walk, the ALJ must minimally articulate why he made such a finding. Here, the ALJ did not do so.

The ALJ also did not discuss whether there were any limiting effects caused by plaintiff's non-severe impairments, including his high blood pressure and obesity. An ALJ must consider a claimant's obesity when determining the aggregate impact of his impairments. *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012). Social Security Ruling 02–1p requires an ALJ to consider the exacerbating effects of a claimant's obesity on his underlying conditions, even if the obesity itself is not a severe impairment, when determining a plaintiff's RFC. *Hernandez v. Astrue*, 277 Fed.Appx. 617, 623–24 (7th Cir. 2008) (citing SSR 02–1p, 2002 WL 34686281 (Sept. 12, 2002)) (other citations omitted). Ruling 02–1p provides that in evaluating the effect of obesity on an RFC, "[a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." SSR 02–1p, at *6. In this case, the ALJ did not mention plaintiff's obesity at all, despite the fact that it was documented in a number of treatment notes and Dr. Lakhani commented that it could be a contributing factor to plaintiff's DVT. Again, the ALJ was within his right to determine that plaintiff's obesity did not affect his RFC, but not without articulating a logical bridge from the evidence that plaintiff was obese to any conclusion that plaintiff's obesity had no impact on his RFC.

Additionally, the opinion evidence the ALJ relied on to support his RFC is insufficient to overcome these defects. Other than a single sentence in some of Dr. Lakhani's treatment notes that

11

plaintiff is able to do light or sedentary work such as in an office, a statement that falls far short of being a detailed, functional analysis of plaintiff's ability to work, the record is devoid of opinions from any of plaintiff's treating doctors. Instead, the ALJ gave some weight to the only functional opinion in the record, that of Dr. Kim, which only discussed plaintiff's shoulder injury, and not the blood disorder the ALJ found to be a severe impairment.[9] And yet, the treatment notes Dr. Kim relies on to support his opinion about Mr. M.'s shoulder condition were from Dr. Lakhani, who only treated plaintiff's DVT.[10]

Moreover, to the extent the ALJ relied on Dr. Garbis' return to work note as evidence of plaintiff's ability to work, the ALJ ignored plaintiff's testimony that he asked Dr. Garbis for such a note only because he needed income. The ALJ also ignored the fact that Dr. Sikand's treatment note was erroneous, because plaintiff was actually not working at the time. Given these omissions, we find the ALJ's reliance on Dr. Garbis' note to be inadequately explained. *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (ALJ may not ignore evidence that undercuts his conclusion).[11]

**B.**

The ALJ's failure to properly assess all of plaintiff's impairments is significant because if the plaintiff was limited to sedentary work, given his age and vocational profile, he would be considered disabled according to the Medical-Vocational Rules. 20 C.F.R. § 404.1569; 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 200.00(a). The Medical-Vocational Rules, or "Grid" reflects the Social

---

[9] The ALJ gives no weight to the opinion of the other Commission doctor, on the ground that he did not provide a functional analysis of plaintiff's ability to work (R. 27).

[10] Although Dr. Lakhani suggests plaintiff can perform "light" and "sedentary" work, there is no evidence that the doctor's understanding and use of these terms matches the social security definitions of what constitutes light and sedentary work.

[11] We do not imply that the ALJ could not rely on Dr. Garbis' return to work note as evidence of whether plaintiff was disabled. We instead emphasize that if the ALJ wishes to do so, that he must address plaintiff's testimony regarding the procurement of the note before deciding what weight it merits.

Security Administration's determination that certain combinations of age, education, work experience, and exertional limitations direct a finding of either disabled or not disabled at step five of the disability analysis. 20 C.F.R. § 404.1569; 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 200.00(a); *Haynes v. Barnhart*, 416 F.3d 621, 627-30 (7th Cir. 2005).

Mr. M. was nearly 53 years old at the time of his injury, which falls into the category of "closely approaching advanced age." *Id.* At that age, the Commission assumes that it is difficult for a claimant to adjust to work other than the kind they are used to, particularly if their RFC limits them to sedentary work. 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 201.00(g). Therefore, if the claimant's skills are not transferable and his or her RFC is limited to sedentary work, the Grid specifies that he or she is disabled. *Id.; McKay v. Colvin*, 15 c 9522, 2016 WL 6432582 *4 (N.D. Ill. October 31, 2016).

In this case, the ALJ stated that transferability of job skills was not material to the determination of disability, presumably because at the "light" exertional level, a claimant closely approaching advanced age with claimant's educational background would be able to work regardless of whether his skills were transferable or not. (R. 28). But, as we discussed above, the ALJ failed to account for plaintiff's DVT when determining his RFC, and thus failed to evaluate whether plaintiff might be limited to sedentary work only, which the Grid says would lead to a finding that claimant is "disabled." 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 200.00(a).

## CONCLUSION

For the above reasons, we grant plaintiff's motion for summary judgment (doc. # 20) and deny defendant's motion (doc. # 28). We remand the case for further proceedings consistent with this opinion. The case is terminated.

**ENTER:**

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: May 15, 2019**